**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ENVIRONMENTAL WORKING GROUP,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**FOOD SAFETY AND INSPECTION SERVICE, et. al.,**<br><br>**Defendants.** | **Case No. 23-cv-03806 (APM)** |

**MEMORANDUM OPINION**

## I. INTRODUCTION

In 2023, Tyson Foods, Inc. launched Brazen Beef, a beef brand aimed at satisfying a growing consumer interest in climate-friendly meat consumption. To tout Brazen Beef as climate-friendly, Tyson Foods applied to the United States Department of Agriculture (USDA), Food Safety and Inspection Service (FSIS) for an "environmentally responsible" labeling certification. As part of the approval process, Tyson submitted a host of information to FSIS. Plaintiff Environmental Working Group, Inc. would later seek that information under the Freedom of Information Act (FOIA). FSIS withheld some of it under Exemption 4. The parties' dispute over those withholdings is now before the court.

For the reasons explained below, the court agrees with Defendants that FSIS properly withheld the information it received from Tyson as both a trade secret and as confidential commercial information under Exemption 4. It therefore grants Defendants' cross-motion for summary judgment and denies Plaintiff's motion for summary judgment.

## II. BACKGROUND

### A. Factual Background

In March 2023, Tyson launched a short-lived effort to market Brazen Beef, a brand that "offer[ed] beef products sourced from cattle produced using the climate-smart agricultural and data management practices" developed through its Climate-Smart Beef Program. Pl.'s Reply in Supp. of Summ. J. & Cross-Opp'n to Defs.' Mot. for Summ. J., ECF No. 31 [hereinafter Pl.'s Reply], Pl.'s Resp. to Defs.' Stmt. of Facts, ECF No. 31-7, ¶¶ 33–4. Before the launch, Tyson sought label approval for an "environmentally responsible" claim through FSIS. Defs.' Combined Mem. in Opp'n to Pl.'s Mot. for Summ. J. & Cross-Mot. for Summ. J. and Mem. of L. in Supp. Thereof, ECF No. 29 [hereinafter Defs.' MSJ Mem.], Ex. H, ECF No. 29-11 [hereinafter Beach Aff.], ¶ 6. According to Tyson, Brazen Beef products were produced with at least 10% less greenhouse gas emissions than conventional beef production. Defs.' MSJ Mem., Ex. G, ECF No. 29-10 [hereinafter First Martin Aff.], ¶ 11. FSIS eventually approved a "CLIMATE FRIENDLY-10% GREENHOUSE GAS REDUCTION*" label. *See* Defs.' MSJ Mem. 2–3; Beach Aff. ¶ 7.

In early July 2023, Plaintiff submitted a FOIA request to FSIS seeking communications between USDA and Tyson Foods containing various search terms related to Brazen Beef labeling. *See* Johnson Decl. ¶¶ 3–4. After negotiating the scope of the request, FSIS issued its final response, producing 106 pages of responsive records but withholding certain information pursuant to FOIA Exemption 4. *Id.* ¶¶ 5–10. FSIS explained that it withheld information that "contains processing procedures and proprietary information revolving around Tyson's Climate-Beef Plan and its accounting methodology." Defs.' MSJ Mem., Ex. B, ECF No. 29-5, at 2. FSIS viewed this information as "commercial or financial information that is customarily treated as private by the business submitters." *Id.* More precisely, the "specific processing procedures are considered

commercial and confidential, in addition to Tyson's business plan as it relates to its new Climate-Beef program." *Id.* FSIS also stated it had considered FOIA's "foreseeable harm standard when reviewing records and applying the applicable exemptions." *Id.*

Plaintiff challenged some of the Exemption 4 withholdings through the administrative appeal process, but the agency did not timely respond. *See* Pl.'s Mot. for Summ. J., ECF No. 20, Pl.'s Mem. of Law in Supp. of Summ. J., ECF No. 20-1 [hereinafter Pl.'s Mem.], at 8.

**B. Procedural History**

Plaintiff then brought this suit. The court set a briefing schedule, and after Plaintiff filed its opening brief, Defendants moved for a stay because it discovered "approximately 215 pages [of] records that are responsive to Plaintiff's FOIA request that have not yet been produced." Mot. to Stay Briefing, ECF No. 23 [hereinafter Defs.' Stay Mot.], ¶ 8. Plaintiff opposed. Pl.'s Opp'n to Defs.' Stay Mot., ECF No. 24. The court ultimately stayed briefing to promote judicial economy and to allow time for the additional responsive documents to be produced. *See* Minute Order, Aug. 28, 2024.

After the parties completed summary judgment briefing, "FSIS located an additional 58 pages of records responsive to Plaintiff's FOIA request." Notice, ECF No. 37, ¶ 4. The court then ordered the parties to confer and determine whether the additional records would require supplemental briefing. Minute Order, May 5, 2026. The parties did not believe additional briefing was necessary, so the court ordered none. *See* Joint Status Report, ECF No. 38.

Separate from this case, Plaintiff sued Tyson in D.C. Superior Court in September 2024, challenging its climate-friendly beef claims as violative of the D.C. Consumer Protection Procedures Act. *See Env't Working Grp. v. Tyson Foods, Inc.*, No. 2024-CAB-005935 (D.C. Super. Ct.). The parties eventually reached a settlement, in which Tyson for a five-year

period agreed not to make public representations, unless substantiated by experts, that (1) its "Climate-Smart" beef programs would produce lower greenhouse gas emissions and (2) Tyson had committed to or had the ability to achieve net-zero greenhouse gas emissions by 2050.[1]

This court held a hearing on July 27, 2026, to discuss whether Plaintiff had received unredacted versions of the requested records in the Superior Court matter. *See* Minute Order, July 15, 2026; Minute Entry, July 27, 2026. The court also wanted to hear whether the settlement agreement impacted the foreseeable harm analysis. *See* Minute Order, July 15, 2026. Plaintiff stated that it had received the documents in discovery but no longer possessed them consistent with the terms of a protective order. Hr'g Tr. (draft), July 27, 2026, at 2–3, 8. Further, Defendants represented that they had conferred with Tyson, and that notwithstanding the settlement, Tyson still could use its underlying work to develop a marketable product line and that disclosure would result in harm because competitors could use it to Tyson's commercial disadvantage. *Id.* at 11–12.

## III. LEGAL STANDARD

### A. Summary Judgment in FOIA Cases

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a FOIA suit, summary judgment is appropriate "if no material facts are genuinely in dispute and the agency demonstrates 'that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been

[1] Settlement agreement is available at https://perma.cc/2G49-YRMZ.

disclosed after redaction of exempt information.'" *Dillon v. U.S. Dep't of Just.*, 444 F. Supp. 3d 67, 82–83 (D.D.C. 2020) (quoting *Prop. of the People, Inc. v. OMB*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018)). "[E]xemptions from disclosure must be narrowly construed, and conclusory and generalized allegations of exemptions are unacceptable." *Morley v. CIA*, 508 F.3d 1108, 1114–15 (D.C. Cir. 2007) (internal quotation marks and citation omitted).

"The government may satisfy its burden of establishing its right to withhold information from the public by submitting appropriate declarations and, where necessary, an index of the information withheld." *Am. Immigr. Laws. Ass'n v. U.S. Dep't of Homeland Sec.,* 852 F. Supp. 2d 66, 72 (D.D.C. 2012) (citing *Vaughn v. Rosen,* 484 F.2d 820, 827–28 (D.C. Cir. 1973)). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Am. C.L. Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011). Such affidavits are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC,* 926 F.2d 1197, 1200 (D.C. Cir. 1991). (internal quotation marks omitted).

**B. FOIA's Exemption 4**

FOIA "mandates the disclosure of documents held by a federal agency unless the documents fall within one of nine enumerated exemptions." *Rudometkin v. United States*, 140 F.4th 480, 486 (D.C. Cir. 2025) (citing 5 U.S.C. § 552(a)–(b)). Exemption 4 permits federal agencies to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). A "trade secret" is "a secret,

commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." *Pub. Citizen Health Rsch. Grp. v. FDA.*, 704 F.2d 1280, 1288 (D.C. Cir. 1983).

Requested documents that "do[] not contain trade secrets" may still be "[]eligible for protection under FOIA Exemption 4," if the withheld information is "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." *Id.* at 1290. Both the terms "commercial" and "confidential" are given their ordinary meanings, as neither term is defined in FOIA. *See Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002). Information is "commercial" if, "in and of itself," it serves a "commercial function" or is of a "commercial nature." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.* (*CREW*), 58 F.4th 1255, 1265 (D.C. Cir. 2023) (quoting *Norton*, 309 F.3d at 38). Information is "confidential" if it is "customarily kept private, or at least closely held, by the person imparting it." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 434 (2019).

But even if Exemption 4 technically applies, "the agency may withhold the record only if it 'reasonably foresees that disclosure would harm an interest protected' by the exemption." *Emuwa v. U.S. Dep't of Homeland Sec.*, 113 F.4th 1009, 1013 (D.C. Cir. 2024) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)).

## IV. DISCUSSION

The parties have narrowed the contested withholdings. What remains in dispute are redactions of two documents, one titled "Greenhouse Gas Accounting Methodology for Tyson Foods Climate-Smart Beef Program" (the "Accounting Methodology") and the other "Tyson Foods Climate-Smart Beef Production & Data Management Plan" (the "Management Plan").

Plaintiff seeks release of the former document in full but only the "Emissions Types and Sources" table ("Emissions Table") contained in the latter. Defendants claim that the withheld information qualifies as both a trade secret and confidential and commercial information.[2] *See* Defs.' MSJ Mem. at 7–11, 14–18. The court takes these arguments in turn and then reviews whether the agency has met its burden to show foreseeable harm.

**A. Trade Secrets**

*Emissions Table.* Defendants properly withheld the Emissions Table's contents as a trade secret. As explained in a supplemental declaration submitted by the Senior Vice President of Tyson's Beef Business, Chad Martin, Tyson gave FSIS its Management Plan, which "details the end-to-end process that Tyson Foods created through its Climate-Smart Beef Program to produce beef products having at least a 10% reduction in [greenhouse gas ("GHG")] emissions from pasture to production against the established baseline." Defs.' Reply in Further Supp. of Cross-Mot. for Summ. J., ECF No. 32 [hereinafter Defs.' Reply], Ex. 1, ECF No. 32-1 [hereinafter Suppl. Martin Aff.], ¶¶ 4, 9. Cattle that are raised following the practices outlined in the Management Plan "are eligible to be labeled as Tyson Foods' BRAZEN™ Beef." *Id.* ¶ 9.

The Management Plan contains the Emissions Table. The Emissions Table "details the specific points in the beef production process at which Tyson Foods has identified GHG emission sources where supplier interventions in the production process, such as the use of regenerative farming methods, can lead to reduced GHG emissions." *Id.* ¶ 10. It "also shows the specific points in the production process at which Tyson Foods collects agricultural and supplier practice data (e.g., farm management data and operational data) and uses its Accounting Methodology to determine an emission reduction value against the industry baseline." *Id.* According to Martin,

---

[2] There is no dispute as to whether the withheld information was "obtained from a person," as required by Exemption 4, 5 U.S.C. § 552(b)(4). *See* Pl.'s Mem., at 10–11.

the Emissions Table is a "trade secret in that it details the specific production processes used to produce BRAZEN™ Beef, which cannot be sold under a label claiming reduced GHG emissions without the process described in the [Emissions] Table." *Id.* Based on that description, the court agrees that the data contained in the Emissions Table is a trade secret because it is part of "plan, formula, process, or device" that Tyson used in the "productive process" for making its Brazen Beef products. *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1288; *see also Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 151 (D.C. Cir. 2001) ("*Public Citizen* narrowly cabins trade secrets to information relating to the 'productive process[.]'").

Plaintiff challenges this conclusion, arguing that the Emissions Table "information is used for a wholly separate purpose tangential to the production process: to assess the climate impact of Tyson's beef supply chain." Pl.'s Reply at 4. It notes that, in his initial declaration, Martin described the Emissions Table as containing "scoping information relating to . . . certain [emissions] metrics." *Id.* (alterations in original) (quoting First Martin Aff. ¶ 17). That quote is accurate, but Martin said far more. True, the emissions data reflects the climate impact of Tyson's supply chain, but it does so for the purpose of producing a specialized beef product that purports to be more climate-friendly than beef made through ordinary processing methods. First Martin Aff. ¶ 11; *see also* Suppl. Martin Decl. ¶ 10. So understood, the emissions data is a component of the Brazen Beef production process itself and not a mere post-hoc assessment of climate impact. It therefore qualifies as a trade secret.

This case is thus different from the two on which Plaintiff relies—*Public Citizen Health Research Group* and *Center for Auto Safety*. In the former¸ the D.C. Circuit rejected the agency's redacting of reports concerning interocular lens adverse-reaction and other data as trade secrets because "[t]he relationship of the requested information to the productive process [was] tangential

at best." *See Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1283, 1290. And in the latter, the D.C. Circuit similarly refused to recognize as trade secrets withholdings that concerned the "physical and performance characteristics of airbags, not how airbags are manufactured." *Ctr. for Auto Safety*, 244 F.3d at 151. Unlike the information sought in those cases, the data in the Emissions Table is central to the "process" of creating Tyson's Brazen Beef product. It is not post-production data about the product's efficacy or safety. Because the Emissions Table is a fundamental part of the production process itself, it qualifies as a trade secret.

*Accounting Methodology.* For similar reasons, the information withheld from the Accounting Methodology is a trade secret. The Accounting Methodology "documents the key assumptions, calculations, and approaches to identify and account GHG emissions in the production cycle and support credible emission reduction claims on beef produced under the Tyson Foods Climate-Smart Beef Program and labeled as BRAZEN™ Beef." Suppl. Martin Aff. ¶ 7. "The Accounting Methodology follows specific identifiable sections of the beef production lifecycle, referred to as nodes, and identifies specific emissions sources associated with each node." *Id.* Thus, the "Accounting Methodology is itself part of a crucial component of the Climate-Smart Beef Program and production process for BRAZEN™ Beef." *Id.* ¶ 8. It thus qualifies as a trade secret for purposes of Exemption 4. *See Pub. Citizen*, 704 F.3d at 1289–90.

Plaintiff's view of the Accounting Methodology withholdings is similar to the one it advanced for the Emissions Table. It seeks to minimize it as a "'plan and process used in producing [Tyson's] *on-label claim*,'" not as part of the Brazen Beef production process. Pl.'s Reply at 5 (quoting Johnson Decl. ¶ 48 and First Martin Aff. ¶ 20). Again, Plaintiff correctly quotes how Johnson and Martin characterized the Accounting Methodology in their affidavits. But its focus on those words alone ignores Martin's detailed description of the contents of the Accounting

Methodology and how it fits into the production process. *See* First Martin Aff. ¶ 19. As Martin reiterates in his supplemental affidavit, the Accounting Methodology "details the key assumptions, calculations, approaches, and business decisions that Tyson Foods uses to identify and account for greenhouse gas emissions associated with cattle used to produced BRAZEN™ Beef." Suppl. Martin Aff. ¶ 8. Or, as he pithily put it, "[t]here is no BRAZEN™ Beef product without the Accounting Methodology." *Id.*

In that sense, this case is similar to the one cited by Defendants, *Cornucopia Institute v. U.S. Department of Agriculture*, No. 16-cv-148 (RC), 2018 WL 4637004 (D.D.C. Sept. 27, 2018). There the court found treating "protocols, procedures, and processes used in organic dairy production" as trade secrets to be "logical and plausible" because "the protocols, procedures, and processes selected by a particular dairy operation are the end product of either innovation or substantial effort and contain each dairy's strategic approaches to organic production." *Id.* at *10. It also held that "sourcing inputs" used in the organic dairy production qualified as trade secrets "because the sourcing inputs utilized by a particular facility are not proscribed by agency regulations, but are instead developed through an iterative process by each dairy operation." *Id.* And finally, it concluded that farm and facility descriptions met the trade secrets definition because they included "design choices made by organic dairies regarding farm and facilities [that] take into consideration factors such as how to optimize use of farm space, efficiency in the movement of cattle from one part of the dairy to another, compliance with . . . regulations, and the safety and welfare of animals." *Id.* Just as the withheld records in *Cornucopia Institute* concerned a productive process, so too does the Accounting Methodology. The only difference is that this case concerns beef not dairy. The Accounting Methodology thus qualifies as a trade secret.

**B. Commercial and Confidential**

The court could stop now and affirm Defendants' withholdings based solely on the withheld information's status as a trade secret. Still, in the interest of completeness, the court considers Defendants' alternative grounds for withholding—that the Emissions Table and Accounting Methodology are "commercial" and "confidential" information obtained from another person that need not be disclosed under Exemption 4. Defs.' SJ Mem. at 14–22; *see CREW*, 58 F.4th at 1262.

*1. Commercial*

Information is "commercial" for purposes of Exemption 4 if it is "commercial in and of [itself]." *CREW*, 58 F.4th at 1263. It must "serve[] a 'commercial function' or [be] of a 'commercial nature.'" *Id.* (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002)). "[I]nformation is commercial if it pertains to the exchange of goods or services or the making of a profit." *Id.* (citing Webster's Third New International Dictionary 456 (1966) (defining "commercial" to mean "of, in, or relating to commerce" or "having profit as the primary aim")). "Exemption 4 paradigmatically applies to records that a business owner customarily keeps private because they 'actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or [that] relate to the income-producing aspects of a business.'" *Id.* (quoting *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290). In short, "[t]he exemption 'applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency.'" *Id.* (citing *Baker & Hostetler LLP v. U.S. Dep't of Comm.*, 473 F.3d 312, 319 (D.C. Cir. 2006)).

The court agrees with Defendants that the information withheld in the Emissions Table and the Accounting Methodology is commercial. It is commercial for the same reasons it is a trade

secret. The records detail the specific production process for Brazen Beef—including the underlying data collection, calculations, and business decisions—and the information that supports its climate labeling claim. *See* Suppl. Martin Aff. ¶¶ 12, 16. In short, "Tyson cannot market and sell the product labeled as Tyson Foods' BRAZEN™ Beef without" them. *Id.* ¶¶ 12, 16; *id.* ¶ 12 (describing the Accounting Methodology as the "backbone and a crucial part of Tyson Foods' Climate Smart Beef Program and BRAZEN™ Beef production process").

These descriptions render the Emissions Table and the Accounting Methodology readily "commercial" under D.C. Circuit precedent. *See CREW*, 58 F.4th at 1265 (citing as examples of "commercial" information, as determined in prior cases, "a firm's data or reports on its commercial service or its product's favorable or unfavorable attributes," "information an industry has gathered regarding its competitive strengths and weaknesses," "health and safety data that medical device manufacturers submitted to the Food and Drug Administration," and "nuclear plant safety reports prepared by a utility industry consortium").

Plaintiff's pushback is that the information withheld has only a "tenuous" or "indirect" connection to the exchange of goods or the making of a profit. Pl.'s Mem. at 11–12 (citing *CREW*, 58 F.4th at 1263). It seeks to frame the withheld information as "emissions-related and environmental impact data" or "noncommercial scientific information." *Id.* at 12–13. But once again, those characterizations do not capture the significance of the withheld information. It defines how Tyson goes about producing the Brazen Beef product and differentiating it in the marketplace. It therefore pertains directly to generating sales and making a profit. Tyson has an obvious commercial interest in such information. And it is a far cry from the kinds of information that the D.C. Circuit has held does not qualify as "commercial." *See CREW*, 58 F.4th at 1265 (citing as non-commercial information "owl-sighting data" created by a federal-state partnership,

a "scientist's research designs" where the scientist was not engaged in trade or commerce, and a "'bare list' of the names and addresses of employees eligible to vote in certain union representation elections"); *id.* at 1266 (rejecting as "commercial" the names of suppliers of a drug used to carry out federal executions).

*2. Confidential*

For information to be confidential, it must "customarily [be] kept private, or at least closely held, by the person imparting it." *Food Mktg. Inst.*, 588 U.S. at 434. There may be a second condition. "[I]nformation might be considered confidential only if the party receiving it provides some assurance that it will remain secret." *Id.* Neither the Supreme Court nor the D.C. Circuit have required the second element of the test, *see id.*; *see also CREW*, 58 F.4th at 1269, and Plaintiff has not insisted that the court treat it as a necessary component, *see* Pl.'s Mem. at 14–16.

The "closely held" factor is easily satisfied. Tyson's declarants explain that the withheld information was "handled as strictly confidential internally at Tyson Foods as only those members of Tyson Foods' small and exclusive cross-functional working group, which was comprised of select individuals in Tyson Foods' beef business and sustainability, legal, and supply chain teams, had access" to the submitted documents. First Martin Aff. ¶ 30; Beach Aff. ¶ 27. Before submission of the label application to FSIS, the "only other individuals granted access to this information and documentation were Tyson Foods' consultants, who were retained to assist with the Program's development and contractually prevented from discussing or disclosing information or documentation concerning the Program to other third parties by a confidentiality and non-disclosure agreement." First Martin Aff. ¶ 30; Beach Aff. ¶ 27. And after the submission, the information remained "restricted and confidential." First Martin Aff. ¶ 30; Beach Aff. ¶ 27. Tyson also keeps such information customarily confidential. First Martin Aff. ¶ 31; Beach Aff. ¶ 28.

Plaintiff's efforts to cast Tyson's practices differently are unavailing. Plaintiff argues that "unredacted passages of the records suggest that Tyson's GHG emissions data and methodology" "was shared with several people across multiple organizations," pointing to consultations with outside experts. Pl.'s Mem. at 15. It further argues that "Tyson incorporated publicly available methodologies into its GHG emissions calculations." *Id.* But Defendants affirm that information was kept closely held, and there is nothing in the record to the contrary. Defs.' MSJ Mem. at 21. Further, to the extent Tyson relied on some publicly available scientific and research information, it "adapted [the] relevant information and components of these materials to its production processes," Suppl. Martin Aff. ¶ 13, and maintained it in strict confidence, *id.* ¶ 17. That some of Tyson's source material was public does not render the withheld information subject to disclosure.

As for the possible second element, in its combined opposition and reply brief, Plaintiff argues for the first time that the withheld information cannot be considered confidential because FSIS did not provide Tyson with any assurance that it would remain secret. Pl.'s Reply at 13–16. It notes that "neither Tyson nor Defendants represent that Tyson received an express or implied assurance of privacy," the agency's webpage provides information on how to request "supporting documentation" for labeling information, and FSIS has supplied similar information in response to a different FOIA request in 2019 involving a chicken labeling claim. *Id.* But these arguments go to the second possible confidentiality factor—an assurance of secrecy—that neither the Supreme Court nor the D.C. Circuit have held is a required showing. And Plaintiff does not explain why this second factor is essential to establish confidentiality. Indeed, their opening brief does not even mention it. *See* Pl.'s Mem. at 14–16.

In any event, courts in this District have not required an assurance of secrecy to establish confidentiality when, as here, the information was submitted on a voluntary basis. Doing

otherwise, they have held, would run afoul of "[t]he current law of the D.C. Circuit, which remains binding authority," that voluntarily supplied information is confidential under Exemption 4 "if it is of a kind that would customarily not be released to the public by the person [or entity] from whom it was obtained." *Renewable Fuels Ass'n v. EPA*, 519 F. Supp. 3d 1, 12 (D.D.C. 2021) (quoting *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992)); *accord Shteynlyuger v. Ctrs. for Medicare & Medicaid Servs.,* 698 F. Supp. 3d 82, 118 (D.D.C. 2023); *Gandhi v. Ctrs. for Medicare & Medicaid Servs.*, 665 F. Supp. 3d 49, 55 (D.D.C. 2023); *Lapidus L. Firm, PLLC v. Wash. Metro. Area Transit Auth.*, No. 20-cv-161 (JDB), 2021 WL 6845004, at *3 (D.D.C. Feb. 25, 2021). As discussed, through Tyson's declarants, Defendants have shown that Tyson has kept the withheld information strictly confidential and customarily does so, and Plaintiff presents no information to cast doubt upon those representations.

The court accordingly finds that Defendants properly withheld the information in the Emissions Table and the Accounting Methodology as "commercial" and "confidential" under Exemption 4.

### C. Foreseeable Harm

Last, the court considers the foreseeable harm requirement. Under the FOIA Improvement Act of 2016, an agency may not withhold responsive information unless it "specifically and thoughtfully determine[s] whether it 'reasonably foresees that disclosure of each particular record 'would harm an interest protected by'" the FOIA exemption. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 372 (D.C. Cir. 2021) (citing 5 U.S.C. § 552(a)(8)(A)(i)(I)). The agency's explanation must be more than a "perfunctory, sweeping, and undifferentiated

declaration that release of every single record withheld" would have some general negative impact. *Id.*

Tyson has provided specific information to establish how the release of the withheld information would harm its business. For instance, it states that disclosure would "allow competitors to approach the market with similar programs without undertaking the significant time, effort, and expense Tyson Foods dedicated to developing this program." First Martin Aff. ¶ 32(a). Specifically, "[r]elease of the information in the Accounting Methodology would allow for reverse engineering of Tyson Foods' Climate-Smart Beef Program and BRAZEN™ Beef production process, interventions with suppliers, cattle supplier qualifications and criteria, as well as business decisions used in the production process to produce BRAZEN™ Beef and attain the 10% reduction labeling claim without the corresponding investments of resources and time." Suppl. Martin Aff. ¶ 19(a). Tyson's "strategic decision-making, if made public, would allow competitors to more quickly enter production without undergoing the necessary research, analysis, drafting of supporting documentation, and process controls." *Id.* ¶ 19(b). Disclosure would further "allow competitors to seek to undermine Tyson Foods' supplier, vendor, and third-party relationships without the financial burden of developing a similar program." First Martin Aff. ¶ 32(b). And, because the withheld information is "inextricably linked to proprietary processes, accounting methods, and other confidential business information," its release "would cause Tyson Foods to lose the value of having an exclusive product offering for customers and consumers who consciously purchase products based on the on-label claim approved through its application through competitors being able to replicate product offerings and claims." *Id.* ¶¶ 32(c), 32(e). With these representations, Defendants thus have met their burden of demonstrating reasonably foreseeable harm.

Plaintiff's objections are not well taken. First, Plaintiff contends that Defendants have not properly differentiated the foreseeable harms as between the two categories of information. Pl.'s Reply at 17. Even if that were a fair criticism at first, the supplemental Martin affidavit cures it. There, Martin separately discusses the foreseeable harms of disclosing the Emissions Table and Accounting Methodology data. *See* Suppl. Martin Aff. ¶ 19. Plaintiff also argues the harm described is generalized and conclusory. Pl.'s Reply at 17–18. Not so. The supplemental Martin affidavit details how competitors could use the potential disclosures to reverse-engineer Tyson's production processes to develop a comparable product without incurring the same costs as Tyson. Suppl. Martin Aff. ¶¶ 19(a), 19(d).[3]

Finally, the court addresses what impact, if any, Tyson's settlement agreement with Plaintiff not to market beef products as climate friendly for a five-year period has on the foreseeable harm analysis. The court thinks none. For one, FOIA requires the agency to make a reasonable harm determination as part of its decision to disclose or withhold requested information. 5 U.S.C. § 552(a)(8)(A)(i)(I). Future events that the agency could not anticipate cannot upend that assessment. For another, disclosure would harm Tyson notwithstanding the settlement. Tyson has not disavowed its pursuit of a climate-friendly beef brand and presumably there remains a market for such products. The settlement does not disturb Tyson's fundamental concern that release of the withheld Emissions Table and Accounting Methodology information would permit a competitor to piggy-back off Tyson's research and investment, thereby saving itself the time and expense of developing their own product line. That is quintessential competitive harm, and such harm is foreseeable regardless of Tyson's current settlement posture.

---

[3] The court does not address Plaintiff's arguments regarding other claimed foreseeable harms, such as to Tyson's business reputation or disincentivizing disclosures to USDA. Pl.'s Reply at 19–20. The harms discussed suffice.

## V. CONCLUSION

For the reasons set forth in this Memorandum Opinion, the court grants Defendants' Cross-Motion for Summary Judgment, ECF No. 29, and denies Plaintiff's Motion for Summary Judgment, ECF No. 20. Plaintiff's Motion for Leave to File a Surreply, ECF No. 33, is denied as Defendants do not raise new arguments in their reply brief.

A final, appealable order accompanies this Memorandum Opinion.

Dated: August 24, 2026

Amit P. Mehta
United States District Judge